# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **EON CORP. IP HOLDINGS, LLC** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL ACTION NO. 6:11-CV-317-JDL** |
| v. | § | |
| | § | |
| | § | **JURY TRIAL DEMANDED** |
| **LANDIS+GYR INC., ET AL.,** | § | |
| | § | |
| *Defendants* | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is: 1) Plaintiff EON Corporation IP Holdings, LLC's ("EON") Motion
for Judgment as Matter of Law (Doc. No. 621); and 2) Defendant Silver Spring Network, Inc.'s
("SSN") Motion for Judgment as a Matter of Law, New Trial, and Judgment on Equitable
Defense of Joint and Several Liability (Doc. No. 636).[1] For the reasons stated below, EON's
Motion for Judgment as a Matter of Law (Doc. No. 621) is **DENIED AS MOOT**. SSN's
Motion for Judgment as a Matter of Law, New Trial and Judgment on Equitable Defense of Joint
and Several Liability (Doc. No. 636) is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

EON filed suit on June 17, 2011, alleging that SSN infringed U.S. Patent Nos. 5,388,101
(the "'101 Patent"); 5,481,546 (the "'546 Patent"); and 5,592,491 (the "'491 Patent")
(collectively, the "patents-in-suit"). Generally, the patents "relate[] to an interactive two-way data
service network for conveying synchronously timed digital messages point to point through the
network." '101 Patent at 1:8–10. SSN answered, denying infringement and alleging invalidity

---

[1] Also before the Court is Plaintiff EON's Motion for Prejudgment Interest (Doc. No. 622) and Motion for Attorney
Fees (Doc. No. 640). These motions will be addressed by the Court in a separate order.

pursuant to 35 U.S.C. §§ 101, 102, and 103 (Doc. No. 50 at 10).   EON proceeded to trial on June 2, 2014, asserting claims 1, 9, 19, and 20 of the '101 patent; claims 1, 2, 3, and 5 of the '546 patent; and claims 1, 2, 5, and 7 of the '491 patent against SSN (Doc. No. 618).

At trial, SSN denied infringement and alleged that the asserted claims were invalid as anticipated.   *See* Tr. 6/5/14 P.M. 3:1-156:1.   At the close of SSN's case, EON moved for judgment as a matter of law ("JMOL") on the issue of validity, which the Court granted in part as to claims 9, 19, and 20 of the '101 patent, and claims 1 and 2 of the '491 patent.   Tr. 6/6/14 A.M. 111:13-115:14.   On June 6, 2014, the jury found the remaining asserted claims valid, and that SSN directly infringed claims 19 and 20 of the '101 patent, claim 3 of the '546 patent, and claims 1 and 2 of the '491 patent (Doc. No. 618 at 2, 3).   To compensate EON for SSN's infringement, the jury awarded EON $18,800,000 in damages.   *Id.* at 4.

## LEGAL STANDARDS

### I.     Judgment as a Matter of Law

A renewed motion for judgment as a matter of law ("JMOL") is a challenge to the legal sufficiency of the evidence supporting the jury's verdict.   *Power-One, Inc. v. Artesyn Tech., Inc.*, 556 F. Supp. 2d 591, 593 (E.D. Tex. 2008) (citing *Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229, 235 (5th Cir. 2001)).   Rule 50 provides that judgment as a matter of law is appropriate if the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.   Fed. R. Civ. P. 50(a)(1).   In ruling on a renewed motion for JMOL, the court may allow judgment on the verdict, if the jury returned a verdict; order a new trial; or direct the entry of judgment as a matter of law.   Fed. R. Civ. P. 50(b).[2]   A post-trial motion for JMOL should be granted only when the facts and inferences so conclusively favor one party

---

[2] In order to advance a renewed motion for judgment as a matter of law under Rule 50(b), the movant must raise the same arguments during trial, in a Rule 50(a) motion for judgment as a matter of law.   Fed. R. Civ. P. 50 (a)-(b).

"that reasonable jurors could not arrive at a contrary verdict." *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007) (citing *Tol–O–Matic, Inc. v. Proma Produkt–Und Mktg. Gesellschaft m.b.H.*, 945 F.2d 1546, 1549 (Fed. Cir. 1991)).  "If reasonable persons in the exercise of impartial judgment could differ in their interpretations of the evidence, then the motion should be denied." *Id.*  Thus, a jury's verdict may be overturned if, viewing the evidence and inferences therefrom in the light most favorable to the party opposing the motion, there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.[3]  *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005) (citing *Delano-Pyle v. Victoria County*, 302 F.3d 567, 572 (5th Cir. 2002)).  The court may not make credibility determinations, nor weigh the evidence.  *Power-One*, 556 F. Supp. 2d at 594 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

## II.    New Trial

Under Federal Rule of Civil Procedure 59, a new trial may be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985).  The Court is required to view the evidence "in a light most favorable to the jury's verdict, and [] the verdict must be affirmed unless the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary conclusion." *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).

---

[3] Because a motion for judgment as a matter of law is a procedural matter not unique to patent law, the law of the regional circuit governs under Rule 50(b).  *See SynQor, Inc. v. Artesyn Techs.*, 709 F.3d 1365, 1373 (Fed. Cir. 2013) ("This court reviews the grant or denial of a motion for JMOL under the law of the regional circuit . . . .").

## EON'S MOTION FOR JUDGMENT AS A MATTER OF LAW OF NO INVALIDITY

At the close of the SSN's case, EON moved for JMOL on the issue of validity, which the Court granted in part as to claims 9, 19, and 20 of the '101 patent, and claims 1 and 2 of the '491 patent. Tr. 6/6/14 A.M. 111:13-115:14. The jury found the remaining asserted claims valid (Doc. No. 618). Thus, EON prevailed on the issue of validity as to all asserted claims. Despite prevailing on the issue of validity at trial EON filed the instant renewed motion for JMOL on June 10, 2014 (Doc. No. 621). EON's arguments focus on the sufficiency of the evidence offered by SSN's expert, Dr. Almeroth. Specifically, EON argues that Dr. Almeroth: (1) applied inconsistent claim interpretations of the patents-in-suit (Doc. No. 621 at 3); (2) failed to sufficiently identify a specific structure for the asserted means-plus function claims, *id.* at 5; (3) failed to provide an element-by-element invalidity analysis, *id.* at 7; and (4) relied on uncorroborated witness testimony, rendering his opinion legally insufficient. *Id.* at 8.

EON's renewed motion for JMOL merely seeks to confirm its favorable outcome on the issue of validity at trial. Accordingly, because EON prevailed on the issue of validity as to all asserted claims, EON's renewed motion for JMOL is **DENIED AS MOOT**.

## SILVER SPRING'S MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND JUDGMENT ON EQUITABLE DEFENSE OF JOINT AND SEVERAL LIABILITY

SSN moves for JMOL, or in the alternative a new trial, on the following grounds:

- No Reasonable Juror Could Find That SSN Smart Meters are "Portable" and "Mobile"

- The Verdict Contains Irreconcilable Conflicts As to Claims 2 and 3 of the '546 Patent and Claims 1 and 2 of the '491 Patent

- No Reasonable Juror Could Find That There are Multiplexed Synchronously Related Data Messages As Required by Claim 3 of the '546 Patent and Claims 1 And 2 of the '491 Patent

- No Reasonable Juror Could Find that Silver Spring's Relays are "Receive Only Stations" as Required by Claim 20 of the '101 Patent

- EON Cannot Recover Damages for Alleged Infringement of Claim 3 of the '546 Patent Before the Certificate of Reexamination Issued on October 4, 2011

- No Legally Sufficient Evidence Supports EON's Claimed Reasonable Royalty or the Jury's Damages Award

- The Court Should Grant Judgment in Favor of Silver Spring on its Equitable Defense of Joint and Severable Liability

- EON's Counsel Made Impermissible Comments During Closing Arguments

## I.  Infringement of the '101 and '491 Patents

### a.  Applicable Law

To prove infringement, the plaintiff must show the presence of every element or its equivalent in the accused device. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). Determining infringement is a two-step process. First, the claim must be properly construed to determine its scope and meaning. Second, the construed claim must be compared to the accused device or process. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). "A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007).

### b.  Analysis

SSN argues that EON failed to produce any evidence to support the jury's finding of infringement as to the '101 and '491 patents because "the accused electric and gas meters that are permanently attached and locked to buildings are not 'mobile' or 'portable' devices that

communicate with the network 'when moved through different geographic zones' as required by the claims."[4] (Doc. No. 636 at 1). SSN also asserts that EON failed to show that the accused meters include facilities for communicating from the subscriber units when moved through different geographic zones,[5] and that EON's closing argument "misled the jurors[,] causing them to arrive at an irrational verdict . . . ." (Doc. No. 636 at 6). SSN asks the court to "grant judgment as a matter of law in favor of Silver Spring, or alternatively, grant a new trial because the jury's infringement verdict was against the great weight of the evidence under either Silver Spring's proposed construction or the Court's determination that no construction was required." (Doc. No. 636 at 10).

EON argues that it presented sufficient evidence to support the jury's finding, focusing primarily on Dr. Kevin Almeroth's[6] testimony on cross examination. While declining to characterize the accused meters as mobile, Dr. Almeroth acknowledged that the meters were portable:

> Q. Is it portable?
>
> A. I think you can carry it around, but—
>
> Q. Well, how about answer yes or no before you give an explanation on this one?
>
> A. Well, the—in the very broadest sense, yes, you can carry it around. **It's portable**.

Tr. 6/5/14 P.M. at 87:14-88:6. He also testified that it would take "maybe a few minutes" to remove one of the meters, *see id.* at 89:14-16, and that the meters do not have to be operational

---

[4] The "mobile" element is found in claims 1 and 9 of the '101 patent, and claims 1 and 2 of the '491 patent. The "portable" element is found in claims 19 and 20 of the '101 patent. The Court declined to construe these terms, deciding that they require nothing more than their plain and ordinary meaning (Doc. No. 249 at 21).

[5] SSN failed to raise this issue in its Rule 50(a) motion at trial, and the Court will not consider it here. *See* Fed. R. Civ. P. 50 (a)-(b).

[6] Dr. Almeroth served as SSN's testifying expert on infringement and validity at trial.

when they are physically moved.  *See id.* at 77:8-15.  EON also offered the following testimony from Dr. Harry Bims:[7]

> Q. Okay. So do you understand that—or what's your opinion with regard to the mobile and the portable elements being met by the meters that have the communication modules in them in Silver Spring's network?
>
> A. So my opinion is that the mobile element is found in the Silver Spring products, especially in light of reading the patent specification in terms of how the—the patent talks about mobility.
>
> Q. And what's—what's your understanding with regard to any difference between the term "mobile" and "portable" as it's used in the patents and—and as it's been interpreted through the Court's claim construction?
>
> A. Well, in the Court's definition, the term "portable" and "mobile" are one and the same.

Tr. 6/5/14 P.M. 180:20-181:10.  Viewing the foregoing testimony as a whole, there is sufficient evidence to support the jury's verdict of infringement as to the '101 and '491 patents.  Dr. Almeroth's testimony as to the portability of the accused meters, coupled with the testimony of Dr. Bims, wherein he equates the terms "portable" and "mobile," provided a sufficient evidentiary basis to support the jury's finding.

EON next argues that it did not mislead the jury, and that even if it did, SSN waived its opportunity to challenge any improper argument because it failed to object during trial.  *See* Doc. No. 647 at 11.  In *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988) the Fifth Circuit found that the plaintiff's failure to object to the impropriety of the defendant's closing argument barred it "'from urging the improper arguments as grounds for a new trial after the jury had returned its verdict.'" (citing *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F.2d 59, 69 (1st Cir. 1984)).  Neither SSN's briefing, nor the trial record reveal any attempt by SSN to object to EON's closing argument.  Thus, SSN waived its opportunity to

---

[7] Dr. Bims served as EON's testifying expert on infringement at trial.

object to the alleged impropriety of EON's closing arguments when it remained silent and let the case go to the jury.

Accordingly, SSN's motion for judgment as a matter of law, or in the alternative, a new trial, as to infringement of the '101 and '491 patents is **DENIED**.

## II.      Irreconcilable Conflicts in the Jury's Verdict

SSN argues that the jury's verdict contains irreconcilable legal conflicts as to the infringement findings relating to claims 2 and 3 of the '546 patent and claims 1 and 2 of the '491 patent.  First, SSN asserts that since the jury found independent claim 2 of the '546 Patent not infringed, but dependent claim 3 infringed,[8] the verdict cannot exist "as a matter of basic patent law." (Doc. No. 636 at 1).  Next, SSN argues that the verdict is irreconcilable as to the jury's finding of infringement as to claims 1 and 2 of the '491 patent because the jury found claim 1 of the '546 Patent not infringed, since EON allegedly presented claim 1 of the '491 patent as being "functionally dependent" on claim 1 of the '546 patent.  *Id.* at 13.  In light of the alleged irreconcilable conflicts, SSN moves for JMOL, or in the alternative, a new trial.  *Id.* at 14.  SSN further argues that "the jury's inconsistent findings on infringement impact the damages verdict and require a new trial as to damages."  *Id.*

EON's principal response is that the jury returned a general verdict, and that SSN waived any objections to the verdict when it failed to object to the alleged inconsistencies before the jury was dismissed (Doc. No. 647 at 12).

### a.  Applicable Law

The Federal Circuit reviews the question of allegedly inconsistent jury verdicts under the law of the regional circuit.  *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1343 (Fed. Cir. 2009); *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1302 (Fed. Cir. 2002).  In the

---

[8] Claim 3 is dependent on claim 2.

Fifth Circuit, a party need not object to the jury's inconsistent verdict prior to the dismissal of the jury if the verdict is *special* and falls under Federal Rule of Civil Procedure Rule 49(a). *See Mercer v. Long Mfg. N.C., Inc.*, 671 F.2d 946, 947–48 (5th Cir.1982) ("We know of no case in this Circuit holding that inconsistencies in special verdicts pursuant to Rule 49(a) are waived if not raised prior to release of the jury."); *see also id.* at 948 n.1 (explaining that waiver does not apply to verdicts under Rule 49(a) but does apply to verdicts under Rule 49(b)). However, the Federal Circuit has found that under Fifth Circuit law, "[i]f the verdict falls under Rule 49(b), which covers general verdicts and general verdicts 'with written questions on one or more issues of fact,' waiver applies if no objection is raised before the jury is dismissed." *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1328 (Fed. Cir. 2013) (citing *Stancill v. McKenzie Tank Lines, Inc.*, 497 F.2d 529, 533–35 (5th Cir.1974) ("By failing to object to the form of the verdict and answers at the time they were announced by the jury, both parties waived any objection to inconsistencies under Rule 49(b).")). Importantly, *Function Media* was a patent case involving a claim that the verdicts of non-infringement and invalidity were irreconcilable. *See id.* at 1327; *accord L&W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318-19 (Fed. Cir. 2006) (applying Sixth Circuit waiver rule in the context of patent case involving alleged irreconcilable verdict) ("Under Sixth Circuit law, a party waives its objection to inconsistency in a jury's verdict if the party had adequate opportunity to object but failed to do so. . . . Thus, we hold that the parties waived their objections to inconsistency in the jury's findings on claims 7 and 10 by failing to object at trial.").

While Rule 49 does not define the term "general verdict," it is commonly known as "[a] verdict by which the jury finds in favor of one party or the other, as opposed to resolving specific fact questions." Black's Law Dictionary (9th ed. 2009). "The theoretical distinction between

general and special verdicts is that general verdicts require the jury to apply the law to facts, and therefore require legal instruction, whereas special verdicts compel the jury to focus exclusively on its fact finding role." Charles Alan Wright & Arthur R. Miller, 9B Federal Practice and Procedure § 2503 n. 1 (3d ed. 2008).

### b. Analysis

Immediately following the presentation of the jury's verdict, the Court asked the parties whether they wished to address anything further.

> THE COURT: All right. Anything further at this time from the Plaintiff?
>
> MR. DACUS: No, nothing from the Plaintiff.
>
> THE COURT: From the Defendant?
>
> MR. MOORE: No, Your Honor. Thank you.
>
> THE COURT: Thank you. We are adjourned.

Tr. 6/6/14 P.M. 115:4-10. SSN remained silent and did not object to the jury's alleged inconsistent verdict at trial. Tr. 6/6/14 P.M. 115:5-10. SSN argues that the jury returned a special verdict under Rule 49(a), and that it was not required to object prior to the jury's dismissal (Doc. No. 651 at 8).

The Court finds that the verdict in this case was general under Rule 49(b). Unlike a special verdict, the jury form here did not require the jury to resolve specific factual questions. Rather the jury was asked to decide "Yes" or "No" as to infringement and invalidity for each of the asserted claims; "they did not decide factual issues and leave for the Court a determination of liability as in a special verdict." *Giddy Up, LLC v. PRISM Graphics, Inc.*, No. 3:060-CV-0948-B, 2008 WL 656504 at *3 (N.D. Tex. Mar. 12, 2008) (holding that jury rendered general verdict and that defendant waived objection to inconsistency in verdict by failing to object prior to jury's

dismissal); *see also Function Media*, 708 F.3d at 1329 (finding jury verdict general under Rule 49(b) where jury answered yes or no questions on each asserted claim).

Since the Court finds that the jury rendered a general verdict, and that SSN failed to object to the inconsistency prior to dismissal of the jury, SSN has waived its objections. It is impermissible for SSN to claim in its post-verdict JMOL that the jury's verdict contains "irreconcilable legal conflicts" that are "a matter of basic patent law," yet have failed to object to such an obvious defect at trial. *See Function Media,* 708 F.3d at 1330 ("It would be improper to allow FM to now argue inconsistencies require an entirely new trial when it failed to object at the only time when an inconsistency could have been cured.")*; see also L & W, Inc.*, 471 F.3d at 1319 ) ("[T]he verdict was a simple one and the issue of inconsistency between the verdicts as to [the independent claim and its dependent claim] should have been obvious.").

Accordingly, SSN's motion for JMOL, or in the alternative, a new trial, regarding the alleged inconsistencies in the jury's verdict is **DENIED**.

## III. Evidence of the "Transmission of Multiplexed Synchronously Related Data Messages" in SSN's Accused Network

### a. Claim 3 of the '546 Patent

SSN argues that claim 3 of the '546 patent "requires full two-way communication of data messages synchronized in an upstream and downstream direction," and that EON failed to present any evidence establishing that SSN's network transmits data messages in a downstream direction (Doc. No. 636 at 17-18). EON does not take issue with SSN's reading of claim 3, but argues that "SSN itself presented evidence that access points in the SSN [n]etwork send data messages to the meters in the system and vice versa."[9] (Doc. No. 647 at 29).

---

[9] For purposes of its infringement argument, EON asserted at trial that SSN's access point device is a base station and that the meters in the SSN network are subscriber units.

The Court finds that EON has failed to present sufficient evidence establishing that the SSN network transmits data messages in a downstream direction as required by claim 3 of the '546 patent. Notably, during his discussion of claims 2 and 3 of the '546 patent, EON's infringement expert, Dr. Bims, testified that "in the Silver Spring system, the smart meters transmit their information regarding meter readings, for example, into the network on what we call the upstream path, and then *control signals* down from the headquarters to the meters." Tr. 6/3/14 P.M. 27:12-16 (emphasis added). Moreover, in discussing how the SSN network functions, Dr. Bims explicitly negates the possibility that the SSN network transmits data messages in a downstream direction to the meters.

> Q. Does the Silver Spring system ever transmit a meter reading from the base station down to the subscriber unit through the receiver?
>
> A. Not to my knowledge.
>
> ****
>
> A. So, yes, in my review of the Silver Spring technical documents, messages like ███████████████████████████████████████████████████████

Tr. 6/3/14 A.M. 122:2-10.

On cross-examination, Dr. Bims was similarly careful to note that control signals—not data messages—are sent in a downstream direction from the access point to the meters.

> Q. Right. And then we talked about downstream routing. Now we're talking about when messages are sent from an access point to a Silver Spring meter. That's downstream routing, right?
>
> A. Yes.

> Q. Okay. And we agree that the—the access point does send messages to meters in Silver Spring's system, right?

> A. Control signals, yes.

*Id.* at 83.  EON fails to point to any other testimony and offers no explanation as to why its own expert's testimony is inconsistent with its position that the SSN network transmits data messages in a downstream direction.

Accordingly, SSN's motion for JMOL as to non-infringement of claim 3 of the '546 patent is **GRANTED**.

### b.  Claims 1 and 2 of the '491 Patent

SSN's argument is premised on its subjective reading of claims 1 and 2 of the '491 patent.  It asserts that those claims require the "transmission of 'multiplexed synchronously related data messages' from [] a base station to subscriber units and also [the] receipt of such data messages [] by a base station from the subscriber units." (Doc. No. 636 at 20).  SSN argues that EON failed to present evidence that there are data messages in the SSN network transmitted in a downstream direction that are synchronously related to data messages sent in an upstream direction (Doc. No. 636 at 18).  EON responds, arguing that claims 1 and 2 of the '491 patent do not require the base station to transmit data messages in a downstream direction to subscriber units (Doc. No. 647 at 25).

The parties' dispute centers on the "base station processing and communication unit" element in claim 1 of the '491 patent.

> base station data processing and communication unit
>> for transmitting to a set of said subscriber units contained within said local base station geographic area associated with said local base station repeater cell and receiving from a subset of said set of local subscriber units multiplexed synchronously related digital data messages of

> variable lengths for point-to-point communication
> between said local base station repeater cell and
> said subset of said local subscriber units

'491 Patent 6:28-37.  At trial, EON's expert, Dr. Bims, outlined the interaction of the base

station, subscriber units, and the receive-only receiver elements contained in the asserted claims:

"[t]he base station . . . communicates with what the claims call a subscriber unit . . . .  The

subscriber units communicate to receivers . . . [a]nd that receiver, in turn, relays information

back to the base station over . . . a wireless route."  Tr. 6/3/14 A.M. 82:5-19.  On cross-

examination, Dr. Bims testified that claims 1 and 2 of the '491 patent do not require the

transmission of data messages from the base station to the subscriber units.

> Q. So what we have here is basically a flow.  Base station sends a message
> to subscriber unit. Subscriber unit responds by sending a message to remote
> receiver.  And then that gets forwarded on back to the base station.  That's the
> EON patent Path A, right?

> A. **So I think we need to qualify here that the base station is sending
> control messages and signals to the subscriber unit**.  The—the subscriber unit
> is responding by sending digital data messages back in to the network.

> ****

> A. Correct. **Digital data messages, such as meter readings, do not flow
> towards the subscriber unit**.

Tr. 6/3/14 P.M. 61:8-24.  He then explained how the foregoing claim elements are present in

SSN's accused network.  Tr. 6/3/14 A.M. 96:12-125:15.

The Court finds that the claim language does not foreclose Dr. Bims' interpretation, i.e.,

it is not clear that the claims require the transmission of data messages from the base station to

the subscriber units.  While SSN's interpretation of the claim language may be reasonable, it has

failed to show that Dr. Bims' interpretation is so unreasonable that this issue is one of law rather

than fact.  Accordingly, the jury was entitled to accept Dr. Bims' reading of the claims, including

his assertion that there is no requirement that data messages flow in a downstream direction from the base station to the subscriber units.

In addition, Dr. Bims testified that the SSN communication modules ████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████.[10]

Q. Okay. And what's the—what's the next term that we're going to consider?

A. So the next term is synchronously related. This term was defined by the—the Court to mean related in time and/or frequency.

Q. And what's the evidence of that occurring in the Silver Spring network?

A. So in the Silver Spring network, their technical documents describe how these NIC, which are network cards or communication modules, are ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████

Q. Okay. And what's the next term we're going to discuss?

A. So the next term is the base station broadcast signal, and the Court has defined that term to mean a wireless signal transmitted to all subscriber units and/or receivers.

Q. Okay. And what's the evidence in Silver Spring for -- for that?

A. So turning to a deposition from George Flammer, who is the Silver Spring chief scientist, when asked the—the question about ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████

Q. Do you have additional evidence also that supports that?

---

[10] In the Claim Construction Order (Doc. No. 249), the Court construed the term "synchronously related" as "related in time and/or frequency."

A. So, again, for the base station broadcast signal term, there are additional documents produced by Silver Spring, which as you can see here talk about

Q. Okay. And you have another slide for this?

A. Yes. So in this slide it shows that the—the meter or smart meter has to

Tr. 6/3/14 A.M. 110:16-112:19.

In viewing Dr. Bims' testimony as a whole, the jury had a sufficient evidentiary basis to conclude that the SSN network involved the transmission of multiplexed synchronously related data messages as required by claims 1 and 2 of the '491 patent.

Accordingly, SSN's motion for JMOL as to infringement of claims 1 and 2 of the '491 patent is **DENIED**.

IV.     **Evidence of "Receive Only Stations" in SSN's Accused Network**

Claim 20 of the '101 patent requires "receive only stations located in said zones for reception of transmissions from subscriber units located in the respective zones." '101 Patent 14:44-47. SSN moves for JMOL on the basis that EON failed to present sufficient evidence that there are receive only stations in SSN's accused network (Doc. No. 636 at 22). EON argues that "SSN tries to limit the claims by requiring the base station to send data messages to the subscriber unit *via the remote receiver*." (Doc. No. 647 at 30) (emphasis in original).

### a. Analysis

At trial, EON presented testimony from Dr. Bims in support of the proposition that the relay device in the SSN network meets the "receive only station" requirement. Tr. 6/3/14 A.M. 120:14-122:10. As discussed above, Dr. Bims specifically noted that the SSN system does not transmit data messages from the access point in a downstream direction to the meters *through* the relay. Tr. 6/3/14 A.M. 121:19-22. He asserted that only "control signals" are sent downstream to the meter; not data messages. *Id.* at 122:2-10. This interpretation is consistent with the Court's Claim Construction Order. *See* Doc. No. 249 at 7-8.

Therefore, the Court finds that EON presented sufficient evidence that the relay device in the SSN network meets the "receive only station" requirement in claim 20 of the '101 patent.

Accordingly, SSN's motion for JMOL as to non-infringement of claim 20 of the '101 patent is **DENIED**.

## V.  Damages for Claim 3 of the '546 Patent in Light of Reexamination

At trial, the jury found that SSN infringed claim 3 of the '546 patent (Doc. No. 618). Claim 3 is dependent on claim 2. SSN argues that Claim 2 of the '546 Patent was substantially amended in a reexamination proceeding and that as a result, "EON's maximum recovery for any infringement of claim 3 of the '546 Patent must be limited to the period commencing October 4, 2011, the date the Reexamination Certificate issued, through October 26, 2012, the date the '546 Patent expired." (Doc. 636 at 23). However, as discussed above, the Court finds that, as a matter of law, EON failed to produce sufficient evidence to support the jury's finding of infringement as to claim 3 of the '546 patent.

Accordingly, SSN's motion for a new trial on damages in light of the reexamination of claim 2 of the '546 patent is **DENIED AS MOOT**.

**VI.     Damages**

SSN moves for JMOL, a vacatur of the damages verdict, or in the alternative, a new trial, on grounds that EON failed to present sufficient evidence supporting a reasonable royalty rate or the jury's damages award.  Specifically, SSN claims: 1) Mr. Lindsay's expert opinion on the reasonable royalty rate lacks a sufficient evidentiary basis because it is based on dissimilar agreements rather rights comparable to the patents-in-suit, and also because he failed to use the most reliable evidence of a reasonable royalty; 2) Mr. Lindsay improperly applied the Entire Market Value Rule; 3) Mr. Lindsay failed to offer a damages opinion for infringement of less than all three patents-in-suit; and 4) EON's closing arguments with respect to its claimed damages was misleading and prejudicial to the jury (Doc. No. 636 at 24-32).

**a.  Applicable Law**

The damages statute, 35 U.S.C. § 284, sets the floor for "damages adequate to compensate for [patent] infringement" at "a reasonable royalty for the use made of the invention by the infringer."  The burden of proving damages falls on the patentee.  *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003).  Calculation of a reasonable royalty requires determination of two separate and distinct amounts: 1) the royalty base, or the revenue pool implicated by the infringement; and 2) the royalty rate, or the percentage of that pool "adequate to compensate" the plaintiff for the infringement.  *See Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 286 (N.D.N.Y. 2009).  A reasonable royalty is based on a hypothetical negotiation that takes place between the patentee and the infringer on the date infringement began.  *Unisplay, S.A. v. American Electronic Sign Co.*, Inc., 69 F.3d 512, 517 (Fed. Cir. 1995).  "Although this analysis necessarily involves an element of approximation and uncertainty, a trier of fact must have some factual basis for a determination of a reasonable royalty."  *Id.*  The trial

court has discretion to discern the reliability of methods used to arrive at a reasonable royalty. *See SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991) ("[D]ecisions underlying a damage theory are discretionary with the court, such as, the choice of an accounting method for determining profit margin, or the methodology for arriving at a reasonable royalty.") (internal citations omitted)).

### b. Analysis

#### 1. Reasonable Royalty Rate

SSN first argues that "Mr. Lindsay's damages opinion is unsupported by the evidence because his sole basis for a starting point royalty ███████ the communication module price is a non-comparable 2005 manufacturing agreement between Silver Spring and ████████" (Doc. No. 636 at 24). At trial, Mr. Lindsay testified that he used SSN's communication modules as a royalty base. Tr. 6/3/14 P.M. 163:24-15.

Q. Can you explain to the jury why?

A. Right. As we've heard about the last few days, there's a variety of components in Silver Spring's smart energy platform. They have the relays, the access points, these communication modules that go into these meters.

And rather than focusing on those other components or even the revenue that those components generate, I limited it to just the communication modules that go into it. And there's a couple of reasons.

One is, as we'll see in some of these documents, Silver Spring refers to that communication module, one, as the key that turns those smart meters on. It takes them from your standard traditional meters to your intelligent meters, and it kind of establishes that two-way communication in a network.

So to me, that's a good indicator of their extent of use, how many of these modules have they sold. It's also something they track. If you were to look at their SEC filings or quarterly releases, they talk about how many intelligent endpoints they have out in the marketplace, and that's the number of these communication modules.

> So I limited my analysis to just that component and the number of those components that have been sold.

Tr. 6/4/14 A.M. 8:3-9:2. Thus, Mr. Lindsay used the communication module as a royalty base because he found that it was an integral component of SSN's accused network, and therefore served as a reasonable indicator of the extent of SSN's infringing activity.

In forming his opinion on a reasonable royalty rate, Mr. Lindsay testified that he considered the following: 1) a 2005 agreement with ███████████ 2) a 2008 agreement with ███████████ 3) a 2010 agreement with ███████████ 4) eight settlement agreements involving the patents-in-suit entered into by EON; and 5) various settlement agreements entered into by SSN. *See id.* at 21:25-37:24. He ultimately determined that the hypothetical negotiation between EON and SSN would have occurred in 2007, *id.* at 13:3-9, and that based on the 2005 ███████████ agreement, the appropriate royalty rate ██████ *See id.* at 31:16-34:24.

SSN takes issue with the fact that Mr. Lindsay's reasonable royalty calculations are primarily based on the ███████████████████████████ agreements, arguing that those "were meant to compensate Silver Spring for various rights, such as technological 'know-how' and intellectual property rights that were not patent-specific." (Doc. No. 636 at 25-26). At trial, Mr. Lindsay fully acknowledged that the hypothetical negotiation would involve only bare patent licenses, rather than additional rights such as "know-how" and other intellectual property rights. Tr. 6/4/14 A.M. 25:13-25. However, he testified that he gave more weight to the ██████ agreement because it would have been contemplated by the parties at the time of the 2007 hypothetical negotiation, as opposed to the later 2008 and 2010 agreements. *Id.* at 39:2-7. Mr. Lindsay further testified that he discounted the reliability of EON's settlement agreements involving the patents-in-suit because such payments are "not intended to reflect

either the rate of a reasonable royalty, an established royalty, or an established base upon which royalties should be paid." *Id.* at 23:3.

> Q. And why—why is it important in your mind that these were settlements of litigation?

> A. Well, if you remember at the beginning, we're talking about a hypothetical negotiation where patents are valid and they're enforceable and they're infringed, right? We're making that assumption. Well, that's not the assumption when these settlement agreements are negotiated.

****

> A. So settlement agreements, just by their nature, are influenced by litigation. There are costs. There are risks. There are uncertainties on what's going to happen. And all of those factors can influence the—the willingness to enter into settlement negotiations. Like I said, there's no assumption of infringement. So it's not comparable to a hypothetical negotiation where you have a willing licensor and a willing licensee for valid and infringed patents.

Realizing that the royalty rate in the ███████ agreement was based on more than bare patent rights, Mr. Lindsay testified that he adjusted his reasonable royalty calculation downward.

> Q. We—I think we've walked through those numbers from ███████ agreement. In your analysis, did you feel it was necessary to adjust those numbers that result from ███████ agreement? And if so, can you talk to the jury about why and how?

> A. Yes, I did. Remember what I mentioned early on about this—about the EON Silver Spring being a bare patent license. It wouldn't be one where they would get the technology and know-how and support of what parts you need and how to get those parts. That's not part of it.

****

*Id.* at 39:2-18. He then explained how he adjusted the calculation downward to reach a per-unit royalty of ██████ the SSN communication modules. Tr. 6/4/14 A.M. 39:8-43:24.

SSN claims that Mr. Lindsay's damages opinion is flawed because he "disregarded EON's own comparable licensing agreements for the '101, '546 and '491 patents . . . ." (Doc. No. 636 at 27). SSN cites *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010),

arguing that EON disregarded the most reliable evidence in the record. However, SSN reads *ResQNet* more broadly than is warranted. In that case, the Federal Circuit decided that "the most reliable license *in this record* arose out of litigation." 594 F.3d 860, 872 (Fed. Cir. 2010) (emphasis added). *ResQNet* was decided in the context of its own record; it does not establish a rule that every damages expert must only weigh past settlement licenses involving the specific patents in suit to arrive at a reasonable royalty. Moreover, post-*ResQNet*, the reliability of settlement agreements derived from litigation can be questioned. Notably, in *ResQNet* itself, the Federal Circuit observed that in certain instances, settlement agreements may have questionable relevance because "the hypothetical reasonable royalty calculation occurs before litigation and that litigation itself can skew the results of the hypothetical negotiation." *Id.* at 872; *see also Small v. Nobel Biocare USA, LLC*, 808 F. Supp. 2d 584, 591 (S.D.N.Y. 2011) (observing that *ResQNet* "cautions that such settlements may be of minimal relevance in light of the possibility that litigation can skew the results of a hypothetical negotiation."); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) (acknowledging the Federal Circuit's "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages."). Given the inherent uncertainty surrounding the reliability of settlement licenses, Mr. Lindsay was not required to assign special or controlling weight to EON's settlement agreements in calculating a reasonable royalty rate. Mr. Lindsay's testimony reflects a conservative and practical approach, wherein he methodically explained why he gave more weight to the ███████ agreement, and why he discounted the EON settlement agreements involving the patents-in-suit. Tr. 6/4/14 A.M. 38:19-43:24.

It is important to note that the licenses SSN points to were not "disregarded," but rather weighed by Mr. Lindsay, and presented to the jury for consideration. SSN is simply unsatisfied

with *how* he weighed them in comparison to the ██████ agreement. The Federal Circuit does "not discount all agreements regarding the technology at issue other than licenses addressing the price terms and circumstances at issue in the case at bar." *SSL Servs., LLC v. Citrix Sys., Inc.*, No. 2013-1419, 2014 WL 5137552 (Fed. Cir. Oct. 14, 2014). In *SSL*, the plaintiff's damages expert relied on agreements that supplied distribution rights to a specific software product, but did not provide a bare patent license. *See id.* at *16. The agreements merely referenced the patent at issue as "intellectual property that was relevant to the technology underlying the agreements." *Id.* Nevertheless, the Federal Circuit agreed with the district court's finding that "'the agreements [were] sufficiently 'comparable' to be probative of the hypothetical negotiation' as they involve[d] the actual parties, relevant technology, and were close in time to the date of the hypothetical negotiation.'" *Id.* (citing *SSL Servs., LLC v. Citrix Sys., Inc.*, 940 F. Supp. 2d 480, 489-90 (E.D. Tex. 2013)). The Court further observed that "SSL's expert expressly addressed the differences between the license negotiations and any hypothetical negotiations, thereby clarifying for the jury where such differences might exist and the limited value of such evidence." *Id.* at 17. Like the expert in *SSL*, Mr. Lindsay specifically addressed the differences between the ██████ license agreement negotiations and a hypothetical negotiation involving only bare patent licenses, allowing the jury to make a reasoned assessment. Nothing prevented SSN from challenging Mr. Lindsay's reliance on the ██████ agreement by way of cross-examination at trial. Clearly, the jury did not wholly credit Mr. Lindsay's analysis, as it rejected his conclusion that a reasonable royalty would amount to $56.4 million.

In addition, this case does not involve the obvious inflation tactics that were an underlying concern in *ResQNet* and *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009). Here, SSN's *entire network* is the infringing product. Rather than

attempting to calculate damages based on the entire SSN network, EON's damages theory was based a single component: the communications module. Presumably, Mr. Lindsay's damages calculation would have been higher had he chosen to base the royalty rate on SSN's infringing network as a whole.

> Q. And you know from testimony and from the work you've done that in fact Silver Spring sells access points, relays, the—the UtilityIQ—

> A. Right.

> Q. —SaaS system—

> A. Right.

> Q. —all of which is accused, correct?

> A. That's what I understand.

> Q. And all of which they derive money or revenues from?

> A. Yes.

> Q. What I'm understanding you to say is you've limited your damages analysis to just the communication modules that they sell.

> A. That's exactly right. That's the communication modules.

Tr. 6/4/14 A.M. 9:12-10:2. In contrast to the circumstances in *ResQNet* and *Lucent*, Mr. Lindsay's royalty rate calculation was not a superficial attempt at inflating the verdict. Rather, it was a practical approach aimed at ascertaining a royalty rate for an entire system or network with several revenue generating components.

## 2. Entire Market Value Rule

In addition, the Court rejects SSN's arguments based on the Entire Market Value Rule ("EMVR"). "The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product [if] the patented feature creates the 'basis for

customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (citing *Lucent*, 580 F.3d at 1336; *Rite-Hite*, 56 F.3d at 1549-50). Thus, the EMVR is inapplicable here because, as outlined above, Mr. Lindsay did not calculate the royalty rate on the value of the accused product, which is the entire SSN network as a whole. Rather, he calculated the royalty based on a component of the SSN network: the communication module.

### 3. Infringement of Less Than All Three Patents-in-Suit

At trial, the jury found that SSN directly infringed claims 19 and 20 of the '101 patent, claim 3 of the '546 patent, and claims 1 and 2 of the '491 patent (Doc. No. 618 at 2). As outlined above, the Court vacates the jury's infringement finding as to claim 3 of the '546 patent. Anticipating a finding of non-infringement as to one of the three patents-in-suit, SSN asks the Court to vacate the damages award or to grant a new trial on the issue of damages because Mr. Lindsay failed to offer a damages opinion for infringement of less than all three patents-in-suit. (Doc. No. 636 at 14-17, 32). In support of its argument for a new trial, SSN relies primarily on *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1309-10 (Fed. Cir. 2007), wherein the Federal Circuit held that a new trial on damages was appropriate in light of the fact that a new trial was required on the issue of infringement. The Court held that the general rule requires a new trial as to damages where the jury renders a "single verdict on damages, without breaking down the damages attributable to each patent." *Id.* (citing *Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299 (1986)). However in *Verizon*, the Federal Circuit observed that there was no reason to depart from the general rule because the parties did not address it in their post-verdict briefing. *Id.*

In contrast to the parties in *Verizon*, EON has provided sufficient justification for the Court to depart from the general rule. First, EON points to the fact that SSN made no objection to the apportionment of damages on the jury verdict form. Even in its responsive briefing SSN admits that it "does not object to the form of the verdict or apportionment of damages . . . ." (Doc. No. 651 at 12). In addition, Mr. Lindsay testified that his damages model was structured such that it would remain the same regardless of the number of claims or patents that were found infringed. Tr. 6/4/14 A.M. 95:17-96:22. He testified that he structured the damages model this way because EON viewed the three patents-in-suit as interrelated. *Id.* at 96:16-19. Moreover, as EON points out, SSN fails to explain why its damages expert, Mr. Blakewell, offered single lump sum damages amount that remained the same regardless of the number of claims or patents found to be infringed. *See* Doc. No. 655 at 8.

Accordingly, despite the Court's vacatur of the jury's finding of infringement as to the '546 patent, SSN is not entitled to a new trial on the issue of damages.

### 4. EON's Closing Arguments

SSN waived any argument as to the impropriety of EON's closing arguments by failing to object during the argument or to move for a mistrial before the case was submitted to the jury. *See Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (holding that plaintiff was barred "'from urging the improper arguments as grounds for a new trial after the jury had returned its verdict.'"). Even if SSN had timely objected to EON's closing argument, it would have to show that EON's argument irreparably prejudiced the verdict or that the jury failed to follow the Court's instructions. *See id.* SSN has failed to make that showing.

Accordingly, SSN's motion for JMOL, or alternatively a new trial as to damages is **DENIED**.

**VI.     SSN's "Equitable Defense of Joint and Several Liability"**

On August 8, 2013, EON executed a settlement agreement (the "Agreement") with Landis+Gyr ("L+G"), dismissing L+G from the instant lawsuit (Doc. No. 636-4 at 15).   The agreement required, *inter alia*, L+G to pay EON ███████████ covering certain L+G products which EON alleged to be infringing.   *See id.* at 8.   SSN claims that those products include L+G electric meters, which incorporate SSN's communication modules (Doc. No. 636 at 33).   Thus, SSN asserts that it is entitled to JMOL on its self-titled "equitable defense of joint and several liability" to prevent EON "from seeking an impermissible 'double recovery' from Silver Spring for the same communication modules incorporated into L+G meters."   *Id.*   EON responds, arguing that: 1) SSN failed to produce any evidence of its sales of the communication modules to L+G; 2) there is no such thing as an equitable defense of joint and several liability; 3) SSN is not a licensee nor an implied licensee under EON's agreement with L+G; and 4) EON is not obtaining a double recovery.   *See* Doc. No. 647 at 38-48.

**a.  Analysis**

On May 20, 2014, the Court held a hearing to consider several motions submitted by the parties (Doc. No. 593).   The Court denied SSN's motion for leave to file an amended answer as to its defense of patent exhaustion, but allowed SSN leave to assert an argument based on (what SSN characterized as) joint and several liability.   *Id.* at 62.   In addition, the Court noted that it would open to addressing the issue of whether EON granted SSN an implied license.   *Id.* at 65. To the extent that SSN raises the defense of patent exhaustion in the instant motion, the Court finds that it is inapplicable for the same reasons considered at the May 20, 2014 hearing. Moreover, the Court finds that SSN's argument premised on joint and several liability is similarly inapposite.   It is black letter law that joint and several liability is a mechanism for a

plaintiff to obtain full recovery from joint tortfeasors, whereby "each liable party is individually responsible for the entire obligation." BLACK'S LAW DICTIONARY (9th ed. 2009). SSN's attempt to assert joint and several liability as a *defense* is inappropriate, especially in light of the fact that SSN is the only liable party in this action.[11]

The only remaining argument SSN has raised is best characterized as an implied license defense.[12] SSN asserts that under Section 9 of the Agreement, "EON was fully compensated for the alleged joint infringement by L+G and Silver Spring arising from the sale of L+G electric meters containing Silver Spring's communication modules that were provided to utilities for use in automated meter reading networks." (Doc. No. 636 at 35). The crux of SSN's argument is that it qualifies as a Licensee Supplier under the Agreement, and that EON granted a full release to L+G and its Licensee Suppliers for all past sales of L+G meters containing SSN communication modules in exchange for ▮▮▮▮▮▮▮ *See id.* at 37.

Under Section 1.8 of the agreement, a Licensee Supplier is defined as



(Doc. No. 636-4 at 7) (emphasis added). The Licensed Product at issue is L+G electric meters. The record is undisputed that SSN

---

[11] SSN argues that "[t]he issue here is whether L+G are jointly and severally liable for infringing EON's patents, namely by selling L+G meters containing Silver Spring communication modules." (Doc. 636 at 36). That issue was not before the jury, and thus, there was no finding of liability as to L+G. Accordingly, the Court will not address that issue here.

[12] In order to determine whether EON granted SSN an implied license, the Court must interpret relevant terms of the EON-L+G Agreement. In the Fifth Circuit, "'[a] settlement agreement is a contract,'" and "the interpretation of an unambiguous contract is a question of law . . . ." *Alford v. Kuhlman Elec. Corp.*, 716 F.3d 909, 912 (5th Cir. 2013). (internal citations omitted). Since the Court finds that the relevant portions of the Agreement are unambiguous, it will construe those portions as a matter of law.

████████████████ communication modules that were incorporated into the L+G meters.[13] (Dresslhuys Decl. at ¶ 13). Thus, the Court finds that SSN falls within the definition of a Licensee Supplier under the settlement agreement.

Under Section 9.2 of the Agreement, EON granted a release and dismissal of all claims against Licensee Suppliers ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* at 16. Finally, in consideration of the entire Agreement, L+G agreed to pay ████████████ to EON. *Id.* at 9. Therefore, L+G's payment necessarily compensated EON for SSN's activities in connection with the Licensed Product, viz., supplying communication modules that were incorporated into L+G electric meters.

EON asserts that the "L+G Agreement was unambiguously, expressly and painstakingly written to exclude SSN and other defendants in this case from any license to EON's patents." (Doc. 647 at 45). EON first points to Section 11.1 of the Agreement which provides:



---

[13] EON asserts that this is a disputed fact, yet has failed to offer any evidence to the contrary. At the May 20, 2014 hearing, the Court made it clear that the parties could request additional discovery on the damages issue, specifically in regard to the settlement agreement at issue here. Tr. 5/20/14 63:12-19. EON's failure to challenge SSN's evidence does not create a factual dispute.

(Doc. No. 636-4 at 17-18) (emphasis added). EON claims that "the language could not be more clear that the rights, release, covenant and license in the L+G Agreement excludes SSN and its products, even if SSN sells those products to L+G." (Doc. No. 647 at 46). EON overlooks the importance of the phrase ████████████████████ in Section 11.1. The issue here is not whether the Agreement conferred rights to SSN with respect to *Third Party Products*; rather the issue is whether the Agreement conferred rights to SSN with respect to *Licensed Products* (L+G meters). The payment L+G provided to EON under the settlement was (at least in part) in consideration of rights conferred to Licensee Suppliers such as SSN with respect to the Licensed Products. Thus, EON's reliance on Section 11.1 of the Agreement is misplaced.

Next, EON asserts that the Agreement excludes SSN from being a Licensee Supplier EON citing Section 10:



(Doc. No. 636-4 at 17) (emphasis added). Under Section 1.8 of the Agreement, ████████ ████████████████████████████████████████████ *Id.* at 7. Third Party products are defined as ████████████████████████████████████████ and the agreement states that ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ *Id.* at 8 (emphasis added). EON argues that these provisions show that the Agreement was "specifically drafted to carve out any license to SSN or any other manufacturer that has not taken a license from EON, even if that manufacturer's

products somehow subsequently become combined with L+G's products." (Doc. No. 647 at 46-47). Again, EON's reliance on these provisions is misplaced. First, SSN is not asserting that it is a Licensee Supplier for *Third Party Products*; rather, it is claiming to be a Licensee Supplier with respect to the *Licensed Products* (L+G meters). Section 10 focuses on Third Party sales of Third Party Products; the issue here is the sale of Licensed Products.

The Court finds that SSN falls within the definition of a Licensee Supplier under the Agreement. By the terms of the Agreement, EON was compensated and SSN was released with respect to SSN's ████████████ communication modules that were incorporated into the L+G meters. It is undisputed that SSN sold ████████████ communication modules during the relevant time period. The jury awarded EON $18,800,000 based on SSN's sale of those ████████ communication modules. Thus, EON's damages calculations including the ████████ communication modules SSN sold to L+G resulted in a double recovery.

"'There is a strong presumption in favor of affirming a jury award of damages. The damage award may be overturned only upon a clear showing of excessiveness . . . . However, when [the] court is left with the perception that the verdict is clearly excessive, deference must be abandoned.'" *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 488 (5th Cir. 2001) (quoting *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir.1995)). Where the Court finds that the jury's verdict is excessive it may grant a "remittitur, or if the plaintiff chooses not to accept the remitted award, a new trial on the issue of damages alone." *Id.* In determining the amount of the remittitur, the Fifth Circuit follows the "maximum recovery rule," whereby damages are reduced to the maximum amount a reasonable jury could have awarded. *Id.* at 489 (citing *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 590 (5th Cir.1985)). "Of course, [the Court's] reassessment of

damages cannot be supported entirely by rational analysis, but involves an inherently subjective component." *Eiland*, 58 F.3d at 183.

Here, the jury awarded EON $18,800,000 for SSN's infringing sales of ████████ communication modules. However, because the Court finds that EON was compensated for ██ ████████ communication modules SSN sold to L+G—████████████████████████ ████████████—the jury's damages award must be remitted to prevent EON from obtaining an excessive recovery. Therefore, the Court adjusts EON's damages award downward ████████ to $12,990,800. Accordingly, EON may either accept the remitted award or request a new trial on the issue of damages.

## VII.   EON's Comments Regarding Willful Infringement

SSN moves for a new trial on the basis that EON made misleading and prejudicial references to SSN's alleged willful infringement. Specifically, SSN claims that "EON's closing argument impugning Silver Spring's post-filing conduct was . . . inaccurate, irrelevant, prejudicial to the jury, and in violation of the Court's decision to grant judgment as a matter of law [in favor of SSN] on EON's willful infringement claim." (Doc. 636 at 40). The Court will not address the merits of this argument, because it finds that SSN waived any objection it may have had to EON's closing argument. As discussed above, failure to object to the impropriety of the closing argument bars a party "'from urging the improper arguments as grounds for a new trial after the jury ha[s] returned its verdict.'" *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988) (citing *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F.2d 59, 69 (1st Cir. 1984)). In addition, even where a party timely objects, a new trial is only warranted if the improper arguments "irreparably prejudice a jury verdict or if the jury fails to follow instructions." *Id.* Neither SSN's briefing, nor the trial record reveal any attempt by SSN

to object to EON's closing arguments. Moreover, SSN has not even attempted to show that the statements made during EON's closing irreparably prejudiced the jury verdict or caused the jury to ignore the Court's instructions.

Accordingly, SSN's motion for a new trial on the basis that EON's counsel made impermissible comments during closing arguments is **DENIED**.

## CONCLUSION

EON's Motion for Judgment as a Matter of Law (Doc. No. 621) is **DENIED AS MOOT**. SSN's Motion for Judgment as a Matter of Law, New Trial and Judgment on Equitable Defense of Joint and Several Liability (Doc. No. 636) is **GRANTED IN PART** and **DENIED IN PART**.

EON may either accept the remitted damages award or request a new trial on the issue of damages within **ten days** from the issuance of this memorandum opinion and order.

So ORDERED and SIGNED this 21st day of October, 2014.

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE